## SEYMOUR et al. v. NATIONAL BISCUIT CO.

### No. 7012.

Circuit Court of Appeals, Third Circuit.

Oct. 18, 1939.

BIDDLE, Circuit Judge, dissenting.

John L. Seymour, of Wilmington, Del., for appellants.

Hobart, Minard & Cooper, of Newark, N. J. (Ralph E. Cooper and John R. Hobart, both of Newark, N. J., of counsel), for appellee.

Before BIGGS, MARIS, and BIDDLE, Circuit Judges.

BIGGS, Circuit Judge.

The appellants, who are respectively remaindermen and the executor of a remainderman under the will of Clara Louise Haskell, deceased, filed an action at law in the

District Court for the District of New Jersey seeking to recover damages from the appellee for the alleged conversion of 188 shares of the common stock issued by the appellee.

Mrs. Haskell died testate in Santa Monica, California, on February 27, 1932. Her will was probated before the Superior Court of Los Angeles County, California. The pertinent portion thereof provided: "The rest of the estate & lot in Florida I give to my son Benjamin Haskell during his life and upon his death to his legal children, if any. If he should die without issue, to my brothers, John, Walter & sister Ida Seymour unmarried equally."

The decree of distribution of the Superior Court, Los Angeles County, California, provided, in part: "All of the rest and residue of said estate to Benjamin Haskell, son of said decedent, during his lifetime and upon his death to his legal children, if any, and if he should die without issue, then to John Seymour, Walter Seymour and Ida Seymour, share and share alike, brothers and sister of said decedent."

Mrs. Haskell possessed 295 shares of the common stock of the appellee at the time of her death. Her son, Benjamin Haskell, accepted 107 shares in settlement of a general legacy of $15,000 provided for by Mrs. Haskell's will. Certificates for the balance of the stock, the 188 shares sub judice, were endorsed in blank by the executor and delivered to Benjamin Haskell. Haskell sent the certificates so endorsed to the appellee, stating that he wished the stock transferred to his name and certificates returned to him. The appellee immediately raised a question as to the manner in which the 188 shares should be registered in Haskell's name, taking the position that the registration must be to Haskell as a life tenant under his mother's will. A protracted correspondence between Haskell and the appellee thereupon ensued.

On March 29, 1933, Haskell wrote to the appellee, stating: "In regard to the 188 shares, which is a part of the residue" being registered in my name as life tenant I would say was not as it should be. In the first place the residue of the estate is very clearly 'given' to me for the remainder of my life. Were it registered as you suggest it would not have been given to me as I would be forever powerless to make any use of it. In the second place I do not think the responsibility of safeguarding the residue of the estate rests upon the National Biscuit Company. In fact, according to the will, I am convinced there is no means by which the residue may be held in check and the terms of the will still be complied with. You have the Court's order to distribute this stock to me, in view of which I feel your responsibility ceases."

On April 5, 1933, the appellee demanded a certified copy of the will which was sent to it, and stated "* * * we shall be obliged to reissue the balance of the stock (the 188 shares) to you as life tenant under the will because of a contingency in the will, which we presume provides that upon your death this portion is to be distributed to other heirs in accordance with the terms of the court order." About April 16, 1933, the appellee received a letter from Haskell again insisting on the registration of the shares in his name without any qualification as to ownership. Thereafter the appellee received further correspondence from Haskell in which he insisted again that the 188 shares were his absolutely, that his ownership was not that of a trustee and that that portion of the will which provided for remainder over was the expression of a wish upon his mother's part and therefore legally unenforceable.

On May 11, 1933 the appellee wrote to Haskell: "This matter was again submitted to counsel who examined your letter and stated that the new stock should be issued as set forth above ('Benjamin Haskell as Life Tenant u/w of Clara Louise Haskell') * * *. In this connection your attention is called to the fact that if you should wish to sell the stock in your name as Life Tenant, there will be no difficulty in connection with the resultant transfer. It will be necessary only that a certified copy of the decedent's will * * be resubmitted to us and that the stock be endorsed by you as Life Tenant with the signature guaranteed in the usual manner." Certificates for the stock were then issued to Benjamin Haskell as life tenant under the will of Clara Louise Haskell.

On March 5, 1934, Haskell, selling the stock, endorsed the certificates as life tenant and his signature was guaranteed by the brokerage firm of Boettcher-Newton & Co., which in turn endorsed the certificates in blank. On March 12, 1934, the appellee's transfer agent transferred the stock and issued new certificates for the 188 shares to Boettcher-Newton & Co.

It appears that the appellants had no notice or knowledge of the contents of Mrs. Haskell's will, of the decree of distribution, of the issuance of the certificates to Benjamin Haskell as Life Tenant, or of his transfer of the stock, until after his death without issue on July 24, 1935. It further appears that the estate of Benjamin Haskell is insolvent. The remaindermen demanded of the appellee that it issue certificates to them for the 188 shares of stock. This demand was not complied with.

Although it is not entirely clear from the complaint, it appears to be the appellant's position that not only did the appellee's refusal to issue certificates for the 188 shares to the appellants upon their demand constitute a conversion, but also that the appellee's cancellation of the certificates issued to Benjamin Haskell as life tenant, and the issuance of new certificates to Boettcher-Newton & Co., with knowledge that the appellants had a vested interest in the residue of Mrs. Haskell's estate was a conversion of the stock by the appellee. The appellants also contend in the alternative that they may recover damages from the appellee for its negligence in transferring the stock in derogation of their rights.

The case was tried by the court without a jury upon the pleadings and stipulated facts. The trial judge entered judgment for the appellee and this appeal followed.

The rights and obligations of Benjamin Haskell and the remaindermen must be determined by the law of California. The provisions of Mrs. Haskell's will became merged in the decree of distribution of the Superior Court. See In re Garrity's Estate, 108 Cal. 463, 38 P. 628, 631, 41 P. 485. The decree of distribution gave to Benjamin Haskell the residue of the estate during his life. There is no provision of the law of California authorizing the probate court to direct a conversion of the testator's property into money. Id. 38 P. page 631. The executor delivered the shares of stock to him. We conclude that Haskell received a life interest in those shares. The will was entirely silent upon the disposition of the corpus of the legacy during the continuance of the life estate. Under the terms of the will Haskell had no right to consume the corpus or to convert the shares into some other kind of security. Nor was the property consumable or perishable. See Underhill, Law of Wills, Section 691. The will contained no words permitting consumption by Haskell for his use or enjoyment, nor did it provide that "what remained" of the estate should go to the remaindermen. Idem, Sections 682, 687.

Relying upon the decision in the Garrity case decided by the Supreme Court of California, the appellee contends that Haskell possessed the status of a trustee of the 188 shares and held them for the benefit of the remaindermen who were cestuis que trustent. The appellee refers to the following language employed by the Court in the cited case [108 Cal. 463, 38 P. 631]: "The testator has the right to make the life tenant the trustee of the property bequeathed, without requiring any security from him; and very slight indications in the will will be construed as showing that the testator intended the life tenant, rather than the executor, to be the trustee, subject, of course, to the general rules applicable to the obligations of a trustee to his cestui que trust." The court also stated that if upon an examination of the will it appeared to be the intention of the testator that the property should be placed in the possession of the life tenant without security, such an intent will be carried out, and if the legatees in remainder deemed it necessary that their rights in the property should be protected, they were compelled to seek such relief from a court of equity.

In the more recent California cases, however, the word "trustee" or "cestuis que trustent" to describe respectively a holder of a life interest in property and remaindermen, are not employed. For example, in the case of Hardy v. Mayhew, 158 Cal. 95, 110 P. 113, 117, 139 Am.St.Rep. 73, the court makes plain that though a duty in the nature of a trust was imposed upon the life tenant, it was of the nature of an implied or constructive trust and the life tenant was a "quasi trustee" for the remaindermen. In the case of Skellenger v. England, 81 Cal.App. 176, 253 P. 191, 194, a decision of the District Court of Appeal for the Third District, that court states that the life tenant "was not a trustee in the ordinary sense in which that word is used. * * The relation created by the agreement was that of life tenant and remainderman." See also Luscomb v. Fintzelberg, 162 Cal. 433, 123 P. 247, 250, 251. We must conclude therefore that the law of California upon this subject is similar to that expressed by the great weight of authority in such cases

as Dickinson v. Griggsville National Bank, 209 Ill. 350, 70 N.E. 593; Ex parte Richardson, 66 S.C. 413, 44 S.E. 964; West v. American Telephone & Telegraph Co., 54 Ohio App. 369, 7 N.E.2d 805; Lynn v. General Motors Corporation, 252 App.Div. 837, 298 N.Y.S. 976.

Haskell therefore possessed no power to sell the stock as a trustee. Nor did he have the power to consume the corpus of the estate or convert the securities which he received from the executor into other securities without the consent of the remaindermen. He was simply a life tenant in possession and his estate was subject to the contingent remainder over. He possessed power to sell only his life estate in the stock. A corporation owes a duty to use reasonable diligence in every case to ascertain whether or not a transfer of the stock requested is duly authorized to be made. See Notes 56 A.L.R. 1199 and 45 L.R.A.,N.S., 1913, at page 1078, subheading (b) and cases cited therein. The fact that Haskell received his life estate by way of a residue and not by way of specific bequest in our opinion in no wise enlarged his powers of sale, disposition or consumption. The remaindermen could not rightly be deprived of their rights in the estate granted by the will. In our opinion such is the law of California in respect to the interests of the remaindermen in the stock.

In determining the right or obligation of the appellee to transfer the stock to Boettcher-Newton & Co. and to refuse to register it in the names of the appellants, we must consider not only the status of the stock under the law of California, but also the rights and obligations of the appellee under the laws of its domicile, New Jersey. Pilger v. United States Steel Corporation, 102 N.J.Eq. 506, 141 A. 737; Andrews v. Guayaquil & Quito Ry. Co., 69 N.J.Eq. 211, 60 A. 568, affirmed 71 N.J. Eq. 768, 71 A. 1133; Amparo Mining Co. v. Fidelity Trust Co., 74 N.J.Eq. 197, 71 A. 605, affirmed 75 N.J.Eq. 555, 73 A. 249. New Jersey has the Uniform Stock Transfer Law (Laws 1916, c. 191, p. 398, N.J.S. A. 14:8–27 et seq.). The appellee contends that under the provisions of that law the delivery of the certificates endorsed by the person named on their face, viz., Benjamin Haskell, effected transfer of the title to the shares. Subsection (a) of Section 1 of the Uniform Stock Transfer Law,

N.J.S.A. 14:8–27, provides that title to a certificate and to the shares represented thereby can be transferred only "by delivery of the certificate indorsed either in blank or to a specified person by the person appearing by the certificate to be the owner of the shares represented thereby." It is entirely clear, however, that Benjamin Haskell was not the owner of the shares and that this fact appears from the certificate. He possessed nothing more than a life interest therein. He did not appear "by the certificate[s] to be the owner of the shares represented thereby." The appellee actually knew that Haskell was not the owner since it possessed a copy of the decree of distribution, a copy of Mrs. Haskell's will and had itself issued the certificates to Haskell. The appellee therefore could not pass title to the shares from Haskell to Boettcher-Newton & Co. by virtue of subsection (a) of Section 1 of the Uniform Stock Transfer Law.

The contention of the appellee to the contrary is in no wise aided by the provisions of Section 5, Chapter 191, Laws of New Jersey of 1916, p. 398, 1 Cum.Supp. pp. 690, 691, N.J.S.A. 14:8–31, cited by it, which provides that "The delivery of a certificate to transfer title in accordance with the provisions of section one is effectual except as provided in section seven * * * though made by one having no right of possession and having no authority from the owner of the certificate or from the person purporting to transfer the title." The certificates sub judice represented a life interest only and full title to the stock therefore could not be passed by their endorsement and delivery by Haskell. Second, Section 7, N.J.S.A. 14:8–33, provides that the delivery of a certificate shall be effectual to pass title and the transfer may not be rescinded if (1) "The certificate has been transferred to a purchaser for value in good faith without notice of any facts making the transfer wrongful * * *." The certificates presented by Haskell to Boettcher-Newton & Co. and by the latter to the appellee were not so transferred for each carried its death wound on its face, it appearing from each that Haskell's interest in the stock was nothing more than that of a life tenant. See West v. Tintic Standard Mining Co., 71 Utah 158, 263 P. 490, 56 A.L.R. 1190;

Geyser-Marion Gold-Mining Co. v. Stark, 8 Cir., 106 F. 558, 53 L.R.A. 684.

The appellee further contends that under the Uniform Fiduciaries Act of New Jersey, Chapter 30, Laws of 1927, p. 65, Supp. of 1925-1930, p. 1910, Rev.St. 3:44–1 et seq., N.J.S.A. 3:44–1 et seq., it was not bound to inquire whether Haskell intended to convert the proceeds of the sale of the 188 shares to his own use. We have made plain our opinion of the extent of Haskell's fiduciary relationship to the remaindermen under the law of California. The Uniform Fiduciaries Act, Section 1, N.J.S.A. 3:44–1, cited by the appellee, defines the term "fiduciary" as including "a trustee under any trust, expressed, implied, resulting or constructive, executor, administrator, guardian, conservator, curator, receiver, trustee in bankruptcy, assignee for the benefit of creditors, partner, agent, officer of a corporation, public or private, public officer, or any other person acting in a fiduciary capacity for any person, trust or estate." Though Haskell's fiduciary relationship towards the remaindermen was limited as we have indicated, none the less we think that Haskell was a fiduciary within the definition of the statute.

Section 3, N.J.S.A. 3:44–3 relating to the registration of securities held by fiduciaries, provides, " * * * If a fiduciary in whose name are registered any shares of stock * * * of any corporation * * * transfers the same, such corporation * * is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in making the transfer, or to see to the performance of the fiduciary obligations, and is liable for registering such transfer only where registration of the transfer is made with actual knowledge that the fiduciary is committing a breach of his obligation as fiduciary in making the transfer, or with knowledge of such facts that the action in registering the transfer amounts to bad faith."

If the appellee was justified as a matter of law in transferring the stock to Boettcher-Newton & Co., it is obvious that it is not liable for conversion of the stock.

The transfer of the stock of a New Jersey corporation is governed by the law of New Jersey. By the express terms of the Uniform Fiduciaries Law, a corporation of New Jersey is liable for erroneous transfer of stock by a fiduciary only upon the terms which we have quoted. But the statute does not authorize the transfer of the whole title to stock upon the application of one who possesses nothing more than a life interest therein. In our opinion, the Uniform Fiduciaries Law therefore has no application under the facts of the case at bar. But if it were held to be applicable and we were to give Section 3 the very broad interpretation which the appellee seeks to put upon it, it is apparent nonetheless that the appellee had actual knowledge that Haskell was committing a breach of his obligation as a fiduciary in making the transfer because the record shows that the appellee had actual knowledge that it was Haskell's duty to hold the stock for the benefit of the remaindermen. By transferring the stock he was acting in breach of his duty and this fact was known to the appellee since it was familiar with the terms of the will, the decree of distribution and face of the certificates.

It follows therefore that that portion of the eighth conclusion of law of the learned trial judge as follows, "There is no proof that the registering of the transfer was made with actual knowledge on the part of the defendant that the fiduciary was committing a breach of his obligation in making the transfer * * *" cannot be sustained. Both the facts and the law are to the contrary. The appellee with actual knowledge of the extent of Haskell's fiduciary relationship aided him in the breach of that duty.

Although we have found no New Jersey cases in point upon this question, the law is nonetheless settled that a corporation stands in the relation of a fiduciary to its stockholders. The appellee stood in such a relationship to the remaindermen. MacKenzie v. Engelhard & Sons Co., 266 U.S. 131, 45 S.Ct. 68, 69 L.Ed. 205, 36 A.L.R. 416; Baker v. Atlantic Coast Line R. Co., 173 N.C. 365, 92 S.E. 170, L.R.A. 1917E, 266; Geyser-Marion Gold Mining Co. v. Stark, supra; Lowry v. Commercial & Farmers' Bank, 15 Fed.Cas. 1040, No. 8581; Peck v. Providence Gas Co., 17 R.I. 275, 21 A. 543, 23 A. 967, 15 L.R. A. 643; Pennsylvania Co. v. Franklin F. Ins. Co., 181 Pa. 40, 37 A. 191, 37 L.R. A. 780; Caulkins v. Memphis Gas-Light Co., 85 Tenn. 683, 4 S.W. 287, 4 Am.St. Rep. 786; 13 American Jurisprudence, Sec-

tions 364 and 374. The appellee's fiduciary obligations in the case at bar are not relieved by the provisions of Section 3 of the Uniform Fiduciaries Law. It follows therefore that the appellee transferred the stock to Boettcher-Newton & Co. without warrant and the appellee was therefore guilty of conversion when after the demand of the remaindermen made on March 19, 1936, it refused to transfer the stock to them. Drug, Inc., v. Hunt, 5 W.W. Harr. 339, 35 Del. 339, 168 A. 87; State v. Carpenter, 51 Ohio St. 83, 37 N.E. 261, 46 Am.St.Rep. 556; Williams v. Everett, Mo.Sup., 200 S.W. 1045; Bower v. Yellow Cab Co., Tex.Civ.App., 13 S.W.2d 708; West v. Tintic Standard Mining Co., supra; Coray v. Perry Irrig. Co., 50 Utah 70, 166 P. 672.

In conclusion we state that if the appellee's contentions be sustained, the court recognizes a trust of the stock only to the end that such trust may be breached and the rights of the remaindermen lost. The life tenant in fact would be permitted to sell more than he has and · the title which he attempts to convey to that which he has not, would be confirmed by the law of trusts despite the breach by Haskell of his duty as a fiduciary. We cannot accept such a view.

Accordingly the judgment of the court below is reversed and the cause is remanded with directions to grant a new trial and to proceed in conformity with this opinion.

BIDDLE, Circuit Judge (dissenting).

I am moved to dissent. The question raised by the appeal is a narrow one, perhaps not free from doubt. It is not, I think, precisely stated by my learned brethren. The confusion arises from a failure to recognize the incidence of the breach. Thus, if Haskell had sold the stock, reinvested the proceeds in unimpeachable securities and held these for the remaindermen, let us say at substantially increased values, the majority would have held, nevertheless, that the remaindermen could insist that National Biscuit Company had committed a breach and must transfer the stock to them. It is not enough to say that Haskell was not the owner. Haskell had a qualified ownership in the stock as did the remaindermen. Neither one nor the others had unqualified "ownership". The question is, I think, simpler than has been indicated. Under the law of California has a life tenant, without express power in the will, implied power to sell securities? By the law of that State a trustee need not obtain an order of court before selling securities, Murphy v. Union Trust Co., 5 Cal.App. 146, 89 P. 988; and apparently a life tenant is charged with the obligations of a trustee. In the absence of a power to consume, and there is none here, he is accountable to the remaindermen for the trust property; but it is not clear from the cases whether or to what extent he can dispose of it. If this legacy consisted of land, personal chattels, or even designated securities, I should be slow in implying any power of sale under the will, but this is a general legacy of the residue of the estate, given to the son of the testatrix during his life, and upon his death to his children, then over to the appellants, in case he died without issue. The gross estate from the Petition for Distribution shows total assets of approximately $38,000, consisting of about $6,000 in cash and the balance in stocks of various corporations.

A power of sale can not only be created in express terms in the will, but will be assumed where it is "necessary or appropriate to enable the trustee to carry out the purposes of the trust".[1] The Restatement points out that "among the circumstances which are of importance in determining the existence of a power of sale are (1) the language of the trust instrument; (2) the purpose of the trust; (3) the character of the property; (4) whether the property is specifically mentioned in the will or other instrument whereby it is transferred to the trustee".

The question is, of course, as to the intent of the testatrix. Our choice may be unsatisfactorily close where, as in this case, the intent is not expressed or indicated, and the best we can do is to prophesy what the testatrix would have done had she considered the problem. She left the balance of her estate, consisting of cash or securities, to her son for his life, but did not set up a formal trust to secure the remaindermen. I conclude that she trusted her son to act like a trustee, and would have wanted him to have the normal power of selling and buying securities. Since the life tenant was clothed with the responsibilities of a trustee, it becomes not unrea-

---

[1] Restatement of the Law of Trusts, § 190(b).

sonable to imply the usual powers to deal with securities. This I think the testatrix would have expected.

The majority have quoted from Re Garrity's Estate, supra, where a similar will was before the California court, who, in affirming a decree in which the life tenant was given possession of personal property, said: "If it appears, from a proper construction of the will, that it was the intention of the testator that the property should be placed in the possession of the life tenant without security, such intention will be carried out." The will before us seems to supply the "very slight indications * * * that the testator intended the life tenant rather than the executor to be the trustee * * *". The majority points out that recent California cases have not described life tenants as trustees. But the law in the Garrity case stands, and we should follow it—that under the will the life tenant was intended to and should have possession of the property with the power to transfer and the attributes of possession. No case cited by the majority opinion in any other State expresses a contrary doctrine.

Of course, if Haskell had the power to sell, the appellee was authorized to transfer the stock to his nominee as long as the certificate was properly endorsed by Haskell as life tenant. Under the Uniform Fiduciaries Act, effective in New Jersey since 1927,[2] a corporation is liable only where such a transfer is made with actual knowledge of the commission of a breach of the fiduciary obligations, or with the knowledge of such facts that the registration amounts to bad faith. Such was not the case here.

The majority think that such a conclusion "recognizes a trust of the stock only to the end that such trust may be breached." This misses the point. Of course, there is a breach of trust, but the breach is that Haskell did not reinvest the proceeds for the remaindermen, just as an express trustee, selling securities and using the proceeds for his own ends, commits a breach; but this does not involve the duty of the corporation to transfer the stock under the direction of the life tenant.

For these reasons I would affirm.